UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PATRICK QUINLISK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:12-CV-430 ERW-NAB |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant ) | |

**REPORT AND RECOMMENDATION**

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying Patrick Quinlisk's ("Quinlisk") applications for disability insurance benefits (DIB) under Title II of the Social Security Act and Supplemental Security Income (SSI) under Title XVI of the Social Security Act. Quinlisk alleges disability due to residuals of cervical fusion, mild degenerative changes of the lumbar spine, and residuals from surgeries of both knees and the right arm. [Doc. 1.] This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1). For the reasons set forth below, the undersigned recommends that the ALJ's decision be affirmed.

**I. PROCEDURAL HISTORY**

On January 7, 2010, Quinlisk protectively filed an application for a period of disability, seeking DIB and SSI. (Tr. 207.) He alleged an onset date of October 7, 2008. (Tr. 207.) The Social Security Administration ("SSA") denied Quinlisk's claim and he filed a timely request for a hearing before an administrative law judge ("ALJ"). (Tr. 129, 136.) The SSA granted Quinlisk's request and the hearing took place on May 17, 2011. (Tr. 110-125.) The ALJ issued

1

a written decision on June 1, 2011, upholding the denial of benefits. (Tr. 89-105.) Quinlisk requested review of the ALJ's decision from the Appeals Council on July 6, 2011. (Tr. 88.) On February 7, 2012, the Appeals Council denied Quinlisk's request for review. (Tr. 1-6.) The decision of the ALJ thus stands as the final decision of the Commissioner. Quinlisk filed this appeal on March 9, 2012. [Doc. 1.]

## II. DECISION OF THE ALJ

The ALJ found that Quinlisk met the insured status requirements of the Social Security Act through December 31, 2012. (Tr. 94.) The ALJ also found Quinlisk has not engaged in substantial gainful activity since October 7, 2008, the alleged onset date. (Tr. 94.) The ALJ noted the Quinlisk's severe impairments included residuals of cervical fusion, mild degenerative changes of the lumbar spine, and residuals from surgeries of the knees and right arm. (Tr. 94.) Quinlisk also had non-severe impairments of anxiety and mild degenerative changes of the feet. (Tr. 94.)

The ALJ noted that a February 3, 2011 physical therapy evaluation by Mr. James Anthony found that Quinlisk could not hold any kind of job, based on the claimant's statements and performance during the evaluation. (Tr. 95.) However, the ALJ found Mr. Anthony was an unacceptable medical source and not a vocational expert, therefore giving his opinion no weight. (Tr. 95.) Dr. Belancourt's evaluation of Quinlisk found him totally and permanently disabled since 2008 due to the findings on exam and his history, but the ALJ found no treatment records and determined Dr. Belancourt's statements were conclusory without support and based on representations made by the claimant. (Tr. 96.)

The ALJ concluded the claimant did not have an impairment or combination thereof that met or medically equaled one of the listed impairments under 20 CFR Part 404, Subpart P,

Appendix 1. (Tr. 97.) Quinlisk was found to have the residual functional capacity to perform light work, with the exception of only occasionally climbing ropes, ladders, and scaffolds and avoiding concentrated exposure to extreme cold, vibration, and the hazards of moving and dangerous machinery and unprotected heights. (Tr. 97.) While the claimant is unable to perform any past relevant work, considering his age, education, work experience, and residual functional capacity, the ALJ found that jobs existed in significant numbers in the national economy that the claimant could perform. (Tr. 100.) Ultimately, the ALJ concluded the claimant has not been under a disability as defined in the Social Security Act, from October 7, 2008 through the date of the decision, June 1, 2011. (Tr. 101.)

## III. ADMINISTRATIVE RECORD

### A. Testimony before the ALJ

The ALJ heard testimony from Quinlisk and Ms. Gonzales, a vocational expert ("VE"). (Tr. 110.) Quinlisk was represented by counsel. (Tr. 110.)

#### 1. Quinlisk's Testimony

Quinlisk testified as follows. He was 53 years old as of the hearing date. (Tr. 112.) He completed the twelfth grade. (Tr. 112.) Quinlisk worked for various employers between 1995 and 2008 as a sprinkler fitter. (Tr. 113.) His last work was for Jaw Hawk Fire Sprinkler Company where he was let go in 2008 because he could not perform his work duties. (Tr. 113-14.)

After being let go in 2008, Quinlisk filed for unemployment where he represented that he was ready, willing and able to work despite his current claims of disability. (Tr. 114.) He subsequently collected unemployment benefits for approximately one and a half years. (Tr. 114.)

Quinlisk had a prior fusion in his neck, and in 2004, he underwent surgery to both knees and his right arm. (Tr. 115.) Quinlisk testified that he was currently experiencing back and neck pain, but he has not sought treatment for his back or neck since 2008. (Tr. 115-16). Additionally, he has not had any x-rays taken of his ankles or knees since 2008. (Tr. 116.) Quinlisk began using his father's cane to help him walk between October and November of 2010. (Tr. 114-15.) He complained of carpal tunnel or arthritis in his hands, his right hand being the worse of the two, (Tr. 120.) however, he has never been examined or had surgery for carpal tunnel. (Tr. 120.) Quinlisk testified that he began seeing Dr. Belancourt in November of 2010 and that he has seen the doctor approximately 15 times. (Tr. 116-17.) Since then he has been taking Hydrocodone for the pain and Xanax to relieve stress, both prescribed by Dr. Belancourt. (Tr. 118-119.)

Quinlisk has problems with his personal care, specifically tying his shoes, showering by himself, going to the bathroom, and shaving. (Tr. 119.) He is unable to hold a razor blade or other small objects for more than a minute since his fingers tend to stiffen up. (Tr. 120-21.) While he can pick up larger items, he is unable to hold them. (Tr. 121.) He has not performed household chores in over a year and a half. (Tr. 117.) Quinlisk further testified that he last drove between two and a half and three years ago, but then Quinlisk admitted he was incarcerated for a DUI in February 2011. (Tr. 122.) He took care of his mother until she passed away in January of 2010. (Tr. 117.) He has not mowed the grass or raked leaves for the past two summers. (Tr. 118.) Quinlisk will occasionally do grocery shopping when he is feeling good, and is still able to take care of his finances. (Tr. 118.)

Quinlisk spends a majority of his waking hours lying on the couch. (Tr. 121.) He recently moved into his brother's home since he has been unable to manage his own home. (Tr. 121.)

### 2. Vocational Expert Ms. Gonzales's Testimony

The ALJ posed three hypotheticals to the Vocational Expert. In the first hypothetical The ALJ asked whether a person of Quinlisk's age, educational background, past work experience who can lift and carry 20 pounds occasionally, 10 pounds frequently, could stand or walk for six hours out of eight, could sit for six hours, could occasionally climb ropes, ladders, and scaffolds, and needed to avoid concentrated exposure to extreme cold, hazards or unprotected heights, vibration, and moving dangerous machinery could return to past relevant work. (Tr. 122-23.) Considering these restrictions, the Vocational Expert opined that the hypothetical claimant could not return to any past relevant work. (Tr. 123.) She stated the hypothetical individual could perform light work such as a cashier or a mail clerk. (Tr. 123.)

In the second hypothetical, the ALJ used the same parameters of the first hypothetical, with the only difference being that instead of standing and walking for six hours and sitting for six hours, this hypothetical claimant required a "sit/stand option" where he could change positions at will. (Tr. 123.) The Vocational Expert testified that the two occupations previously mentioned – mail clerk or cashier – would still be available positions for the second hypothetical individual. (Tr. 123.) While there would be 75% fewer positions as a cashier considering the constraints, there would be no reduction on available positions as a mail clerk. (Tr. 123-24.)

The third hypothetical was based on a Residual Functional Capacity questionnaire ("RFC") completed on May 16, 2011, by Dr. Belancourt. (Tr. 124, 344.) The RFC contained the following restrictions. Quinlisk could only sit or stand for five minutes, before needing to get

5

up; sit and stand or walk less than two hours in one eight-hour workday; must walk every five minutes for one minute; shift positions at will from sitting, standing, or walking; take unscheduled work breaks every five to ten minutes for between one to five minutes; use a cane; only rarely lift up to ten pounds, never lift over ten pounds; rarely look down; never turn head right or left, look up or hold head in static position; rarely twist or stoop; never crunch or squat, climb ladders or stairs; and able to be absent from work more than four days per month. (Tr. 342-344.) Based on this hypothetical, the Vocational Expert stated that the hypothetical claimant would not be able to return to any past relevant work, or any other work. (Tr. 124.)

The Vocational Expert testified that, with the exception of the inconsistency pertaining to the sit/stand option, her testimony was consistent with the DOT and Selected Characteristics of Occupations. (Tr. 124.)

### B. Medical Records

On November 20, 2008, Quinlisk visited DePaul Heath Center complaining of chronic cough, difficulty breathing, foot and ankle pain, and pain in both knees. (Tr. 324-27.) He reported that he was a smoker, and a chest x-ray revealed mild peribronchial thickening, but no active or acute lung infiltrate was identified. (Tr. 324.) A foot x-ray identified no fracture or dislocation and only mild degenerative changes considering Quinlisk's age. (Tr. 325.) Additionally, x-rays of both ankles and both knees were unremarkable. (Tr. 326-27.)

On December 1, 2008, an MRI of the Lumbar Spine revealed no evidence of any spinal fracture, or any significant central canal stenosis. (Tr. 321.) There was an indication of mild discogenic degenerative change from L2-L3 through L4-L5 with minimal to mild lateral recess and neural foraminal stenosis at these levels. (Tr. 322.)

On January 30, 2009, Quinlisk went to DePaul Heath Center emergency room indicating extreme pain in the left shoulder and arm caused by a fall three days earlier at a Walgreens. (Tr. 307-317.) An x-ray of Quinlisk's left shoulder showed no evidence of a fracture or dislocation, and the radiographs appeared unremarkable. (Tr. 304.) An x-ray of his elbow revealed mild bony spurring; however it showed no definite acute fracture or dislocation. (Tr. 305.) A CT examination of the cervical spine indicated no fracture or malalignment but did show anterior cervical fusion of C5-C7. (Tr. 309.)

On March 11, 2010, Dr. Charles K. Lee conducted an RFC assessment of Quinlisk based on a review of the medical and non-medical evidence. (Tr. 334.) The RFC contained the following restrictions. Quinlisk could walk, sit or stand with normal breaks for six hours in an eight-hour workday, occasionally lift or carry up to twenty pounds, and frequently lift or carry up to ten pounds. (Tr. 330.) Quinlisk could frequently climb ramps, stairs, ladders, ropes, or scaffolds, frequently stoop, kneel, crouch, or crawl, and occasionally balance. (Tr. 331.) He needed to avoid concentrated exposure to extreme cold, vibrations, and hazardous situations involving machinery or heights, but he had no limit on exposure to extreme heat, wetness, humidity, noise, or fumes. (Tr. 332.)

On January 18, 2011, Quinlisk first saw Dr. Dunet Belancourt. (Tr. 356.) He reported that he was applying for disability, and he complained of pain in both of his knees. (Tr. 356.) He informed Dr. Belancourt of a back surgery he had to C5-6, C6-7 from a job injury in 1989, a right forearm fracture from an auto accident in 2004, and pneumonia treatment from De Paul in April of 2010. (Tr. 356.) He complained of headaches, dizziness, and joint pain. (Tr. 356.) No tests were performed that day, but Dr. Belancourt prescribed Vicaprofen for Quinlisk. (Tr. 356.)

7

On February 3, 2011, Belancourt referred Quinlisk to Midwest Physical Rehab, LLC with a diagnosis of peripheral neuropathy bilateral hands, low back pain, generalized weakness, and abnormality of gait, and osteoarthritis hips, knees, shoulders, cervical fusion. (Tr. 345.) There, Quinlisk reported having moderate to severe pain in his lower back and legs and decreased control of the movements of his hands and fingers. (Tr. 345.) He rated his pain as varying from a 5 to an 8, on a 0 to 10 scale, with 0 being no pain and 10 being severe pain. (Tr. 345.) A Physical Therapist, James Anthony, determined Quinlisk would be unable to hold any kind of job based on his statements and performance during the evaluation. (Tr. 346.)

On March 23, 2011, Quinlisk saw Dr. Belancourt for a follow-up appointment concerning pain in his back. (Tr. 355.) He complained of shooting pains in his hips down to his knees, problems sleeping because of the pain, and anxiety. (Tr. 355.) He was subsequently prescribed Xanax. (Tr. 355.)

On April 20, 2011, Quinlisk saw Dr. Belancourt for a prescription refill for his Xanax, Vicaprofen, and strips for his diabetic testing monitor. (Tr. 354.) On May 2, 2011, Quinlisk saw Dr. Belancourt for another prescription refill of his Xanax and Vicaprofen. (Tr. 353.)

On August 9, 2011, Quinlisk was admitted to the DePaul Health Center Emergency Department after presenting with an altered mental status. (Tr. 12.) He showed signs of substance abuse, was unresponsive, agitated, and exhibited abnormal behavior. (Tr. 12.) History provided by Quinlisk, EMS personnel, and a friend indicated this was a new problem for Quinlisk. (Tr. 12.) He quickly improved after treatment, and had no other symptoms. (Tr. 12.) He was given hydrocodone-acetaminophen for pain, meloxicam, alprazolam for anxiety, metformin, levofloxacin, lancets, chlorpromazine for nausea and vomiting, Pepcid PO, and a multivitamin daily tablet. (Tr. 15.) He was discharged the same day. (Tr. 18.)

On August 10, 2011, Quinlisk returned to DePaul Health Center Emergency Department with thoughts of suicide. (Tr. 24.) His examination revealed severe depression, but nothing remarkable appeared in his physical examination. (Tr. 24.) He was provided with psychiatric treatment, and his depression and anxiety improved. (Tr. 30.) Quinlisk was discharged on August 24, 2011. (Tr. 31.)

On August 25, 2011, Quinlisk was admitted to DePaul Health Center Emergency Department with thoughts of suicide and depression. (Tr. 35.) While alcohol and cocaine abuse were still present, his physical examination was once again unremarkable. (Tr. 35.) He was treated and discharged the following day. (Tr. 40.)

On August 26, 2011, Quinlisk was voluntarily admitted to St. Joseph Health Center where he presented with severe depression and suicidal ideations. (Tr. 67.) Quinlisk was found to have alcohol and cocaine dependency issues, and a previous history of chronic anxiety and suicidal symptoms. (Tr. 67.) Quinlisk received medication for pain in his mid-upper back and knees. (Tr. 79.) Following daily treatment groups and a regimen of medications, he was discharged to New Life Evangelistic Center on September 1, 2011. (Tr. 65-66, 87.)

On November 6, 2011, Quinlisk returned to DePaul Health Center Emergency Department complaining of thoughts of suicide. (Tr. 45.) He claimed to have refrained from alcohol and drug abuse for the past three months (Tr. 45.), and lab results tested negative for drug use. (Tr. 48.) He underwent a full spectrum of biopsychosocial interventions, and strict suicide precautions were implemented. (Tr. 51.) He was discharged on November 16, 2011 with no thoughts of suicide. (Tr. 51.)

On December 1, 2011, Quinlisk returned to DePaul Health Center Emergency Department complaining of thoughts of suicide. (Tr. 56.) He admitted to heavy alcohol and

drug use over the past few days, but denied any physical complaints. (Tr. 56.) His physical exam was unremarkable. (Tr. 56.) He received psychiatric treatment and was discharged to a group home on December 28, 2011 with no suicidal ideations. (Tr. 61-62.)

## IV. LEGAL STANDARD

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

The Social Security Administration uses a five-step analysis to determine whether a claimant seeking disability benefits is in fact disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). First, the claimant must not be engaged in substantial gainful activity. *Id.* Second, the claimant must establish that he or she has an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities. 20 C.F.R. §§ 416.920(c), 404.1520(c). Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the appendix to the applicable regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). Fourth, the claimant must establish that the impairment prevents him or her from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(f). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity to perform a significant number of jobs in the national economy. *Singh v. Apfel,* 222 F.3d 448, 451 (8th Cir. 2000). If the claimant satisfies all of the criteria under the five-step evaluation, the ALJ will find the claimant to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v).

It is the ALJ's function to resolve conflicts among opinions of various physicians and reject conclusions of any medical expert if they are inconsistent with the record as a whole.

*Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir. 1995). Subjective complaints of a disability benefits claimant may be discounted if there are inconsistencies in the evidence as a whole. *Guillams v. Barnhart,* 393 F.3d 798, 801 (8th Cir. 2005).

It is not the job of the district court to reweigh the evidence or review the factual record de novo. *Id*. This court reviews decisions of the ALJ to determine whether the decision is supported by substantial evidence in the record as a whole. *Smith v. Shalala,* 31 F.3d 715, 717 (8th Cir. 1994). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision. *Id.* Therefore, even if this court finds that there is a preponderance of evidence against the weight of the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. *Gwathney v. Chater,* 104 F.3d 1043, 1045 (8th Cir. 1997).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;
(2) The education, background, work history, and age of the claimant;
(3) The medical evidence given by the claimant's treating physicians;
(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
(5) The corroboration by third parties of the claimant's physical impairment;
(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and
(7) The testimony of consulting physicians

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

In considering subjective complaints, the ALJ must fully consider all of the evidence presented, including the claimant's prior work record, and observations by third parties and treating examining physicians relating to such matters as:

(1) The claimant's daily activities;

(2) The subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) Any precipitating or aggravating factors;

(4) The dosage, effectiveness, and side effects of any medication; and

(5) The claimant's functional restrictions.

*Polaski v. Heckler*, 725 F.2d 1320, 1322 (8th Cir. 1984). It is not enough that the record contains inconsistencies; the ALJ is required to specifically express that he or she considered all of the evidence. *Id.*

## V. DISCUSSION

Quinlisk alleges two points of error on appeal. First, he asserts that the findings of the RFC did not find support in "some" medical evidence. Second, Quinlisk alleges that the hypothetical question to the vocational expert did not capture the concrete consequences of his impairment, and as a consequence the response of the vocational expert was not substantial evidence on which the decision could rely at step 5 of the sequential evaluation process.

### A. RFC Determination

Quinlisk contends that the decision of the Administrative Law Judge failed to properly evaluate the medical opinion evidence of record under the requirements of 20 C.F.R. §§ 404.1527, 416.927. Consequently, he maintains that the decision fails to point to "some" medical evidence for its findings of residual functional capacity. Specifically, he asserts error

with respect to the amount of weight given to the opinions of the non-treating, non-examining physician Dr. Lee and Quinlisk's treating physician, Dr. Belancourt. Since residual functional capacity is a medical determination, the ALJ is "required to consider at least some supportive evidence from a professional." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001); *Singh v. Apfel,* 222 F.3d 448, 451 (8th Cir. 2000). Additionally, Quinlisk asserts that the additional evidence submitted to the appeals council provides additional evidence in support of Dr. Belancourt's opinion.

The ALJ found Dr. Belancourt's findings that Quinlisk had been totally and permanently disabled since 2008 to be conclusory, without support and based upon the representations of the claimant, as there were no treatment records provided by Dr. Belancourt. (Tr. 96.) The ALJ found Dr. Belancourt's conclusory statements conflicted with substantial medical evidence contained in the record and therefore entitled his opinion to no weight. (Tr. 99.) The ALJ also rejected any disability stemming from the claimant's anxiety since it was mild, he had not received any psychiatric care, and he presented no evidence that it has or will last for at least 12 months. (Tr. 96.) The ALJ placed "significant weight" on the evaluation of Charles K. Lee, M.D., a non-examining physician, from March 11, 2010. (Tr. 97.)

After the ALJ's decision, Quinlisk submitted additional evidence to the Appeals Council, which consisted of medical records from Dr. Belancourt's office regarding visits by Quinlisk between January and May 2011 and records from SSM Depaul Health Center and SSM St. Joseph Health center dated from August 2011 and December 2011. In cases involving the submission of supplemental evidence subsequent to the ALJ's decision, the record includes that evidence submitted after the hearing and considered by the Appeals Council." *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000) (citing *Jenkins v. Apfel*, 196 F.3d 922, 924 (8th Cir.

1999)). "In reviewing decisions based on an application for benefits, if new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. §§ 404.401(c), 416.1470(b). "To be new, evidence must be more than merely cumulative of other evidence in the record." *Perks v. Astrue*, 687 F.3d 1086, 1093 (8th Cir. 2012). "[Evidence] is material if it is relevant to claimant's condition for the time period for which benefits were denied." *Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008). "[The] additional evidence must not merely detail after acquired conditions or post-decision deterioration of a pre-existing condition." *Bergmann*, 207 F.3d at 1069-1070. "Additional evidence showing a deterioration in a claimant's condition significantly after the date of the Commissioner's final decision is not a material basis for remand, although it may be grounds for a new application for benefits." *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997).

"In such a situation, "[a] court's role is to determine whether the ALJ's decision 'is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made.'" *Bergmann*, 207 F.3d at 1068. "In practice, this requires [a] court to decide how the ALJ would have weighed the new evidence had it existed at the initial hearing." *Id.* (citing *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994)). Thus, the appropriate inquiry is not whether the Appeals Council erred, but whether the record as a whole supports the decision made by the ALJ. *Perks*, 687 F.3d at 1093 (citing *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000)).

The Appeals Council considered the additional evidence submitted, but found that this information did not provide a basis for changing the ALJ's decision. (Tr. 2.) The Appeals Council noted that the additional records submitted from Dr. Belancourt contained "almost no

clinical findings of any kind." (Tr. 2.) The Appeals Council did not consider the medical records from Depaul and St. Joseph Health Centers, because those records contained information regarding Quinlisk's care after the ALJ's decision on June 1, 2011. (Tr. 2.)

Based on the submission of additional treatment records from Dr. Belancourt, the undersigned finds that ALJ's decision was not based on substantial evidence on the record as a whole. A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *see also Hacker*, 459 F.3d at 937. When given controlling weight, the ALJ defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. 404.1527(a)(2); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005). The ALJ's decision gave no weight to Dr. Belancourt's opinion, because "[t]he doctor only provided a medical source statement without corroborating treatment notes. There was no evidence of any objective findings presented to Dr. Belancourt." Further the ALJ did not recognize Dr. Belancourt as a treating physician. Instead, the ALJ gave significant weight to Dr. Lee's opinion, although Dr. Lee was a non-treating examining physician. (Tr. 97.) The additional evidence submitted to the Appeals Council and made part of this record includes Dr. Belancourt's treatment records. Therefore, the new evidence directly addresses the reasons why the ALJ failed to place any weight on Dr. Belancourt's opinion. Therefore, the undersigned recommends that this case be reversed and remanded for reassessment of the RFC in light of the additional treatment records from Dr. Belancourt.

### B. Hypothetical to the Vocational Expert

In his second assertion of error, Quinlisk alleges that the hypothetical question posed to the vocational expert failed to capture the concrete consequences of his impairment, thus it was not substantial evidence on which the ALJ could rely upon. However, upon remand a reassessment of the RFC may affect the hypothetical given to the vocational expert. Therefore, the undersigned will not address this second assertion of error.

## VI. CONCLUSION

In summary, the undersigned recommends that this action be reversed and remanded for a reassessment of Quinlisk's RFC in consideration of the additional evidence contained in Exhibit 8F.

**IT IS HEREBY RECOMMENDED** that the relief which Plaintiff seeks in her Complaint and Brief in Support of Complaint be **GRANTED** in part, and **DENIED,** in part. [Doc. 1]; [Doc. 17].

**IT IS FURTHER RECOMMENDED** that a Judgment of Reversal and Remand be issued pursuant to 42 U.S.C. § 405(g), sentence 4 remanding this case to the Commissioner of Social Security for further consideration consistent with this report and recommendation.

**IT IS FURTHER RECOMMENDED** that the Court order the ALJ, on remand, to reevaluate the medical opinion evidence and RFC in consideration of the additional evidence submitted by Quinlisk in Exhibit 8F.

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this 8th day of March, 2013.

    /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE